*FILED*

*JUL 27 2012*

*U.S. DISTRICT COURT*
*CLARKSBURG, WV 26301*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

SHERYL KING,

      **Plaintiff,**

v.                                 **Civil Action No.  1:12CV22**
                                          **(The Honorable Irene M. Keeley)**

MICHAEL J. ASTRUE,
**Commissioner of Social Security,**

      **Defendant.**

### REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision of the Commissioner of Social Security (hereinafter "Defendant," and sometimes "Commissioner") denying her claims for Supplemental Security Income (hereinafter "SSI") and Disability Insurance Benefits (hereinafter "DIB") under Titles XVI and II, respectively, of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.  The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

### I.  Procedural History

Sheryl King (hereinafter "Plaintiff") filed applications for DIB and SSI on March 12, 2008,[1] alleging disability beginning December 31, 2004, due to "problems with [her] back, [her] leg and [her] vision" (R. 173).  Plaintiff's applications were denied at the initial and reconsideration levels

---

[1]As a threshold matter, for purposes of Disability Insurance Benefits ("DIB"), Plaintiff must establish disability on or before her date last insured ("DLI") of March 31, 2008.  There is no such time limit for her Social Security Income ("SSI") claim. 20 C.F.R. Section 404.130.

(R. 80, 81, 82, 83). Plaintiff requested a hearing, which Administrative Law Judge George A. Mills, III (hereinafter "ALJ"), held on May 5, 2010 (R. 42). Plaintiff, represented by counsel, testified on her own behalf. Also testifying was Vocational Expert Larry Ostrowski (hereinafter "VE"). On June 9, 2010, the ALJ entered a decision finding Plaintiff was not disabled through the date of the decision (R. 12-24).

On December 23, 2011 the Appeals Council denied Plaintiff's request for review (R. 1-4). With the Appeal Council's May 27, 2011, denial of Plaintiff's request for review, the ALJ's decision became the final decision of the Commissioner, and Plaintiff filed her Complaint in this Court on January 30, 2012.

## II. Statement of Facts

Plaintiff was born on August 29, 1960, and was 43 years old at the time she alleges she became unable to work, 47 on her Date Last Insured, and 49 years old at the time of the ALJ's decision (R. 24). Plaintiff completed the eleventh grade of high school and obtained her GED (R. 56). Plaintiff had past work as a waitress, bartender, and telemarketer (R. 62-63).

Plaintiff filed her applications on March 12, 2008, alleging an onset date of December 31, 2004. There are, however, no records of treatment or examination in the record prior to a consultative examination requested by the State agency in May, 2008. Plaintiff did testify at the administrative hearing that she had been involved in a severe automobile accident in 1975, breaking her shoulder, wrist, foot, and leg. She also testified she had surgery for patellar dislocation of the right knee in 1975. She testified she went to a chiropractor a few times in the 1980's.

Plaintiff's initial Disability Report, which she completed face-to-face with an SSA employee on March 12, 2008, shows Plaintiff's height as 5'3 and her weight as 140 pounds (R. 172-182). She

2

reported her disabling problems as problems with her back, her leg, and her vision. Her symptoms caused her to become unable to work on December 31, 2004. Regarding Medical Records, the only doctor she had seen was an eye doctor for examination and glasses in 2005 (R. 175). She was on no medications, and had had no testing.

The SSA employee noted that Plaintiff had no problems hearing, reading, breathing, understanding, concentrating, talking, answering, sitting, standing, walking, seeing, using hands, or writing (R. 181). She described Plaintiff's behavior, appearance, etc. as follows:

> In office 47 y/o white female (who appeared much older than her stated age – looks about 65) accompanied by her 2 y/o granddaughter who currently lives with her. Neat and clean in appearance in stylish blue jeans and a vibrant maroon chenille sweater with hair done and makeup. Recent incarceration for driving on a suspended license. Incarcerated for 6 months (May-November 2007).

(R. 182). The employee noted Plaintiff brought in no medical evidence.

Plaintiff completed a Function Report, describing her own daily activities as follows:

> I get out of bed, get my Grandchildren up and dressed and fed, clean house and do laundry best as I can. Fix my grandchildren lunch, continue household chores, take care of Grandchildren, fix dinner, put Grandchildren to bed, watch T.V. and then go to bed.

(R. 183). She then stated she cared for two grandchildren "24/7 best as possible Feed, bathe, clothe." A friend helped when the children needed to be transported by car.

Plaintiff stated she woke up several times a night from pain. She had no problem with personal care. She prepared meals daily, usually "with a couple of courses" but sometimes ate sandwiches or frozen foods. She did say she couldn't prepare the meals as fast as she used to. She cleaned house and did laundry in small loads, every day "but it takes all day." She did not do yard work. She went outside a couple times a week, and rode in a car. She shopped for food once or

twice a month, each time taking an hour or two. She could pay bills, handle cash, and handle a checking and savings account. She read books and watched tv. There was no change in her hobbies since her alleged onset date.

She spent time with others, talking on the phone to family and friends, and seeing her mother or sister about once a month.

Plaintiff stated her impairments affected her ability to lift, squat, bend, stand, reach, walk, kneel, limb stairs, see, complete tasks, concentrate, use hands, and get along with others (R. 188). She said she could only lift 20-30 pounds (not continuously). "Continuous" bending, squatting, kneeling, and reaching hurt, and affected her concentration, tasks, and ability to get along with others. Also she could "hardly see out of her [right] eye." She could walk about 100 yards and then have to rest 10-15 minutes. She could pay attention an hour or two. She followed spoken instructions fairly well, but written instructions not very well because she "can not see real good." She said she did not get along with authority figures very well, but had never been fired or laid off from a job because of problems getting along with other people. She stated she did not handle stress or changes in routine very well.

The first record in the administrative transcript is a consultative examination performed on May 7, 2008, by Kathleen Monderewicz, M.D., at the request of the State agency (R. 221). Plaintiff stated her disability was due to neck and low back pain, knee problems, and vision problems. The doctor noted that, although Plaintiff gave a five-year history of neck and low back pain she never had a medical evaluation for the pain, had no x-rays or MRI's, and had not undergone any physical therapy, injections, or surgery. She later did state she had chiropractic treatment for her neck and back in the 1980's. She said she went three or four times and it briefly helped.

4

Plaintiff said she had difficulty lifting more than 20-25 pounds. She also underwent surgery for patellar dislocation of the right knee in 1975, and said she has had a longstanding history of bilateral knee pain that caused her to fall, and persistent numbness in that leg. She had an x-ray in 1975 prior to her surgery.

Plaintiff also reported difficulty seeing, and examination showed her far vision was decreased, much worse in the right eye. The doctor noted, however, Plaintiff was not wearing prescription eyeglasses, and did not have a recent eye examination.

Plaintiff's height was 5'3 ½" and her weight was 144 pounds.

Upon examination, Plaintiff ambulated with a right limp. She did not require the use of an assistive device. She appeared stable at station and comfortable sitting, but uncomfortable supine. She had tenderness over the right shoulder. Left shoulder, elbows and wrists were nontender. Tinel's testing was positive at the right elbow and right wrist and Phalen's positive at the right wrist. Her right hand was tender over the metacarpal phalangeal joints. Range of motion was normal. She had no nodes or atrophy. She could make a fist. Her grip strength was normal when squeezing the doctor's finger, but diminished when using the dynometer. She could write with her dominant hand and pick up coins with either hand.

Plaintiff's right knee had a surgical scar. The right knee had severe tenderness. The left knee was not tender, but both had hypermobility of the patellae with increased discomfort with displacement. There was crepitus only over the right knee. The ligaments, ACL, and PCL were intact and stable. McMurray's testing was negative bilaterally.

The plaintiff had tenderness over the cervical spine at C6 and milder tenderness at C7, as well as right sided paravertebral muscle tenderness and tenderness of the upper trapezius muscle.

Plaintiff's dorsolumbar spine had normal curvature with no evidence of paravertebral muscle tenderness or spasm. There was tenderness over the lumbar spine at L5-S1. The sacroiliac joints were tender, more so on the right. Straight leg raising sitting and supine were negative on the left siting and supine and negative on the right sitting but positive on the right in the supine position at 70 degrees. She was unsteady trying to stand on one leg at a time. There was no hip joint tenderness. Plaintiff could walk on her heels and perform tandem gait without problem. She could squat only two-thirds of the way due to increased knee and low back pain. Toe walking caused pain due to plantar's warts and a bunion. Dr. Monderewicz's impression was:

1.    Chronic cervical strain with question of right cervical radiculopathy versus peripheral entrapment neuropathy with carpal tunnel syndrom and/or ulnar nerve entrapment neuropathy;

2.    Possible tendinopathy or impingement of the right shoulder with tenderness and decreased range of motion and history of clavicle fracture.

3.    Chronic lumbosacral back pain.

4.    Chronic bilateral patellofemoral pain of the knees with history of recurrent subluxation of the patellae, status post right knee surgery for patellar dislocation. The right knee probably also has some degenerative joint disease. By history and exam the claimant also appears to have suffered some sensory loss in the peroneal nerve distribution of the right leg, but this has not caused any right foot drop.

5.    Bunion of the right big toe.

6.    Plantar warts of the right foot.

7.    Decreased visual acuity with right worse than left. The claimant needs an opthalmological

evaluation.

Dr. Monderewicz's summary is as follows;

Sitting, standing, walking bending, squatting, kneeling, crawling, lifting, and carrying are limited due to chronic low back pain, chronic knee pain, and findings on right foot exam. Lifting, carrying, and use of the right upper extremity overhead are also limited by chronic cervical strain and findings on right shoulder exam. The claimant may also have difficulty with repetitive use of the right upper extremity with possible peripheral nerve entrapment neuropathy with positive Tinel's and Phalen's testing. Despite this handling objects with fine manipulation still appeared intact bilaterally.

X-ray of the lumbar spine on May 15, 2008, was normal.

Plaintiff's applications were denied at the Initial level on June 30, 2008. She requested reconsideration on July 23, 2008. She reported no changes in her impairments, and still reported no treatment or medications, since her initial application.

On August 7, 2008, State agency reviewing physician Cynthia Osborne completed a physical Residual Functional Capacity Assessment ("RFC"), opining that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk about 6 hours in an 8-hour workday, and sit about 6 hours in an 8-hour workday. She could never climb ladders, ropes, or scaffolds, crouch or crawl, and could only occasionally climb ramps and stairs, balance, stoop, or kneel. She should avoid concentrated exposure to temperature extremes, hazards, and vibration.

Dr. Osborne opined that Plaintiff was partially credible, as her Activities of Daily Living were not fully supported by the findings (R. 236). She noted Plaintiff's own report that she lived with friends and took care of her grandchildren (as best she could). She got out of bed, got the grandchildren up and dressed and fed them, cleaned the house and did laundry (best she could), fixed the grandchildren lunch, continued household chores, took care of grandchildren, fixed dinner, put grandchildren to bed, watched tv, and then went to bed. She had no problems with self care,

prepared meals with a couple of courses, did household chores, shopped for food once or twice a month, read books, talked on the phone to family and friends, and used glasses to read.

The doctor noted Plaintiff stated on March 28, 2008, that it had been hectic "as she was babysitting 3-4 hours a day for a 9 month and 2 year old" (R. 238).

There are no records of treatment or examination between the consultative exam performed pursuant to Plaintiff's application in March 2008, the normal x-ray in May 2008, and the RFC August 2008, until June 2009. Through August 2008, Plaintiff admittedly had no changes in her impairments, saw no doctors, and took no medications.

A June 9, 2009, MRI showed disc herniation at L3-5 with moderate foraminal stenosis and multilevel facet DJD (R. 249). Cervical MRI showed facet degenerative changes at C4-5, some mild endplate osteophyte formation at C5-6, and mild diffuse disc bulge with endplate osteophyte at formation at C6-7.

Plaintiff's claim was denied at the reconsideration level on August 14, 2008. She requested an administrative hearing on December 22, 2008. Her request was acknowledged on February 10, 2009.

On October 12, 2009, Plaintiff presented to Dr. Davis, who became her treating physician. This is the first actual treatment record in the administrative transcript. She said she had seen Dr. Miller "in the past" and said the pain medication and Klonopin weren't working. She said she had a history of herniated disks in her lumbar and cervical spine, recent bunion surgery, and history of previous knee surgery at age 15. She reported that both knees hurt and her right knee gave out unexpectedly. She said her chest hurt, and she had thought it was her heart, but was told it was panic. She smoked a pack of cigarettes per day. She requested increased pain medication and

Xanax. The doctor prescribed naproxyn for pain and prilosec for heartburn or GERD, and physical therapy for her neck and shoulders.

On October 13, 2009, the prilosec was changed to Prevacid for GERD (R. 244).

Plaintiff had an initial evaluation for physical therapy on November 2, 2009 upon referral by Dr. Davis (R. 267). The assessment was mechanical lower back pain and a subluxing right patella. Historically she said she had chronic lower back pain for 20 years with baseline pain at 4-5 out of 10. She had difficulty with stairs due to right knee pain. She was able to lift and carry small items at home such as a laundry basket, but was limited due to right knee and lower back pain. She could walk further than 500 feet with difficulty, without assistive aids. The physical therapist's goal for Plaintiff was for her to be able to walk an unlimited distance with difficulty but no ambulatory aids. She was opined to have severe pain and limitation in a specific recreational activity and the goal was to have only mild pain in a specific recreational activity. The recommendation was 8 weeks of physical therapy, once per week, to attain these goals.

Plaintiff went to physical therapy a total of three times during the next month, and never returned after December 3, 2009.

On November 16, 2009, Plaintiff appeared for a follow up with her doctor. She said her pain medicine and Xanax were working "better." Some days she was very sad. She was under a lot of stress, but her panic was much better controlled on Xanax.

On December 8, 2009, Plaintiff presented to Richard Douglas, M.D., a neurologist, upon referral from Dr. Davis, for her complaint of low back pain and cervical pain. She was "currently applying her third attempt at Social Security Disability." The symptoms had been ongoing "for

numerous years." She said she had been involved in physical therapy[2] and chiropractic care[3] but no pain management. She complained of bilateral leg pain and right arm pain. She had been taking hydrocodone over the last six to eight months. Her weight was 146.

A review of systems indicated "No history of depression or treatment of psychiatric disease."

Upon physical exam, SLR was negative bilaterally. She had full motor strength in all major muscle groups. Sensory exam showed she was intact to pinprick throughout all major dermatomes.

A review of the 2009 MRI revealed a disc protrusion at L3-4 to the left, a disc protrusion at L4-5 to the left, and normal disc space at L5-S1 with no evidence of radiculopathy. MRI of the cervical spine revealed degenerative changes but no nerve root compression.

Dr. Douglas' diagnosis was cervical pain and lumbar pain with right leg pain. Although the MRI revealed disc protrusions at L3-5, she had no evidence of L3-4 radiculopathy. Although her cervical MRI revealed degenerative changes there was no spinal cord compression.

On December 16, 2009, she had a follow up with Dr. Davis (R. 243). She was still smoking. The doctor advised her of concerns regarding continued use of Premarin and smoking. She felt better on Trileptal.[4] She was sleeping ok on amitriptyline.[5] The doctor had a long talk with her about the importance of quitting smoking. She said her pain medication was "perfect?"" She was assessed with bipolar disorder, chronic back pain, estrogen replacement therapy, and tobacco cessation.

---

[2]As noted, she went three times in one month and then never returned.

[3]As noted, this took place in the 1980's.

[4]An anticonvulsant Dorland's, supra, at 1967, 1355.

[5]Antidepressant also having sedative effects. Dorland's, supra, at 63.

Plaintiff's discharge summary from physical therapy notes that she only appeared three times from November 2 through December 3, 2009, and had never returned (R. 267).

On January 15, 2010, Plaintiff had a follow up with Dr. Davis (R. 242). She reported she had just come "from giving up granddaughter to her mother." She couldn't breathe and couldn't stop crying. It was unplanned. She took an extra Xanax. The doctor found her distraught, anxious, and crying. He noted she had been doing better on Wellbutrin[6] "until this AM's surprise visit." She was assessed with acute anxiety/hyperventilation; bipolar disorder–stable; right leg and foot pain; and estrogen replacement therapy. Her weight was 151.

On February 1, 2010, Plaintiff was brought to the hospital by EMS for what was termed at the time a "psychotic break." It was noted she was combative, and spitting at staff. It was also noted that she had "missed 3 days of meds." (R. 288). She responded to Haldol[7] and Ativan and was admitted. The admitting physician was her doctor, Dr. Davis (R. 263). The History states:

> Ms. King is a 49-year-old Caucasian female with a history of bipolar disorder who has recently been markedly agitated and had decreased sleep related to family problems. She has been the sole caregiver for her grandchild who turns 4 in a couple of months and for a younger sibling up until the past couple of weeks when her daughter reentered the picture and decided that she now wanted to be the care giving parent. With no signed documents to protect the grandmother, she has had to give the children up to the mother. Although this has been a gradual process and it sounds like the daughter is making attempts to keep the grandmother included, she is [sic] just become increasingly distraught about this situation.
>
> On the night of this admission, the grandmother was visiting in the daughter's home

---

[6]A monocylic compound structurally similar to amphetamine, used as an antidepressant and as an aid in smoking cessation to reduce the symptoms of nicotine withdrawal. Dorland's, supra, at 261.

[7]An antipsychotic used especially in the management of psychoses. Dorland's, supra at 818.

with the grandchildren.  It was apparently getting close to time for her to leave.  She became somewhat hyper-ventilatory and questionably had actual seizure activity.  She became loud verbally accusive  and "out of control."  911 was called and when the ambulance arrived on the scene, the emergency medical services (EMS) crew noted that the patient was claiming to be God, that she attempted to take control of the ambulance, and that they had to physically restrain her from that.  She became quite combative with those who were trying to help her settle down and in fact eventually required four-point restraints.  She has little memory of the specific events, remembers that someone was sitting on her chest in an effort to restrain her.  She notes that she was given something intravenously to calm her down and she then was brought to the emergency department.

Dr. Davis listed Plaintiff's past medical history as "significant for longstanding anxiety and recent increased chronic pain problems.  She has recently come to my practice and has been on long term treatment with Xanax and hydrocodone." Her current medications include Trileptal, Premarin,[8] amitryptyline at bedtime, Wellbutrin, piroxicam,[9] and Xanax.  She had also been on Lorcet Plus as needed.  She smoked a pack and a half a day, and denied use of any illicit drugs.  Laboratory studies showed positive for THC, however (R. 265).

He noted her psychiatric status as "mildly agitated, but certainly controlled."  She did not appear to require any further one-to-one observation.  She denied any hallucinations or suicidal or homicidal intent.

Dr. Davis' impression was :

Acute psychosis in a patient with recent decreased sleep, increased anxiety due to situational stress, and recent addition of Wellbutrin to her other medications.  Now appears stable with an increase in her dose of Trileptal and discontinuing of the bupropion.[10]

---

[8]Trademark for preparation of conjugated estrogen.  Dorland's, supra, at 1510.

[9]A nonsteroidal antiinflammatory drug (NSAID) used for treatment of rheumatoid arthritis, osteoarthritis, ankylosing spondylitis, gout, calcium pyrophosphate deposition disease, and dysmenorrhea. Dorland's, supra, at 1450.

[10]Generic for Wellbutrin.  Dorland's, supra, at 261.

Dr. Davis listed Plaintiff's additional problems as

1.    Chronic pain;

2.    Recurrent right patellar dislocation; and

3.    Polycythemia[11] probable secondary to chronic obstructive pulmonary disease and current significant dehydration.

Dr. Davis encouraged Plaintiff to drink more fluids and wanted to assure sleep with proper sedatives.

Plaintiff had a consultative examination with psychiatrist Muhammad Salman, MD, on February 2, 2010, while at the hospital (R. 272).  He noted she had a "long history of bipolar disorder."  She was admitted "for worsening of her depressive symptoms."  He stated she was "apparently [] overwhelmed with taking care of her grandsons."  She reported she was unable to sleep at night and was having mood swings.  "She is overwhelmed with her family situation."  Her daughter was making attempts to keep Plaintiff away from the children "and this is what is making her extremely distraught.  Prior to coming to the hospital the patient was visiting her daughter with her grandchildren.  She apparently started to hyperventilate.  Emergency Medical Services were called and the patient reportedly called herself as 'God.'  She also reportedly tried to take control of the ambulance.  She had to be restrained."

On mental status examination, Plaintiff was awake, alert and oriented x3.  She appeared to have some hypomanic symptoms.  She appeared to be psychotic.  She denied any homicidal or suicidal ideation.  Her insight and judgment appeared poor.

Dr. Salman's diagnosis was Bipolar disorder manic/depressive mixed episode, with a Global

---

[11]Increase in the total red cell mass of the blood.  Dorland's, supra at 1488.

Assessment of Functioning ("GAF") of 30. He decreased Plaintiff's amitriptyline and discontinued Wellbutrin, and added Geodon.[12]

On March 18, 2010, Plaintiff was provided Notice that she would have her administrative hearing on May 5, 2010 (R. 116).

The next medical record is from April 15, 2010, two months after her hospitalization for the psychotic episode. On that date, Plaintiff was admitted to the hospital with cough, aching, and decreased energy over the last 1-2 weeks (R. 254). She was noted to be a poor historian and did not answer questions directly. She said she took "some antibiotics" that she had left over and did not know what it was. She smoked 1 ½ packs of cigarettes a day. She weighed 133.3 pounds. The doctor noted it was "very difficult" to get a "review of systems" because Plaintiff again was "a difficult historian." She was diagnosed with right pyelonephritis[13] and atelectasis[14] or early developing pneumonia.

Plaintiff followed up with Dr. Davis on April 26, 2010 (R. 241). She said she was feeling much better. She had been hospitalized for pyelonephritis. She was breathing better and cut way back on smoking. She had lost 20 pounds in the last three months on Geodon. She was making herself eat to help from losing more weight due to the Geodon. Her side no longer hurt at all. She had a refill of Geodon, but not on Premarin, Xanax, or Lortab. She was diagnosed with anxiety, pyelonephritis, lower back pain, and estrogen replacement therapy.

A urine screen was positive for THC (R. 246).

---

[12]An antipsychotic. Dorland's, supra at 2092.

[13]Inflammation of the kidney and renal pelvis because of bacterial infection. Dorland's, supra at 1558.

[14]Incomplete expansion of a lung or portion of a lung. Dorland's, supra, at 171.

At the administrative hearing on May 5, 2010, the ALJ noted there were no "issues of a mental treatment prior to the DLI [Date Last Insured]," to which Plaintiff's counsel replied that was correct (R. 51).

Plaintiff testified she weighed 127 pounds, and that she weighed 155 pounds in the hospital but lost the weight since her "nervous breakdown."

Plaintiff testified she had three grandchildren, ages 11, 4, 2, and a newborn. When asked if she was taking care of the children, she said "Well, I try to help my daughter as much as I can but a lot of time, I have to walk away because I just don't have the patience."

When asked if she had a driver's license, Plaintiff testified she did not. The following dialogue took place:

Q:      Do you have a driver's license?

A:      No, sir.

Q:      Have you ever had one?

A:      Yes, sir.

Q:      When did you - -

A.      Well I got into some trouble and now I don't think that  me driving would be the best thing.

Q:      When did this occur, that caused you to lose your license?

A.      Well, I got into - - I got into some trouble and then I lost my license, and I was driving without my license, and I had to pay for that, which wasn't easy.

Q:      Did you lose your license because of drinking or something like that?

A:      Yeah, I was drinking and driving after my girlfriend [unintelligible].

Q:      How far back was that ma'am?

A:      That was in 199 – I think it was in 1990.  I'm no - -

Q:      And you've never driven since then?

A:    No.  Well - -

Q:    Illegally you did.

A:    Yes, illegally I did.[15]

(R. 55).

Plaintiff testified she used to get welfare benefits until her daughter got out of prison two or three years ago,  and took over full-time  care of the grandchildren.

The ALJ asked if the only time she'd ever been treated for mental problems was the breakdown in February, to which Plaintiff responded she had been treated "years ago."  She testified that from 2004, her alleged onset date, until then, she had no contact for mental health issues.  Her last time being treated for "some other problems" was in the late 1980's.

The ALJ asked the  Vocational Expert ("VE") a hypothetical including a light exertional level, sitting and standing/walking 6 hours out of an 8-hour day, no climbing ladders, ropes, or scaffolds, with limited climbing and no crouching or crawling.  Occasional ramps, steps, balancing, stooping and kneeling, no temperature extremes, vibrations or hazards.  The VE testified that with those limitations, a person of Plaintiff's age, education, and background could still perform her past work (R. 74).

The ALJ then asked the VE if Plaintiff's testimony and the consultative examiner's records were considered as good and credible evidence, opining she could not complete an 8-hour workday because of problems relating to concentration, persistence and pace, or she would need to be absent 3-4 days in a month, if there would be any jobs, to which the VE replied there would not.

---

[15]The Disability Report, completed by an SSA employee, who was face-to-face with Plaintiff on March 12, 2008, noted Plaintiff had "recent incarceration for driving on a suspended license.  Incarcerated for 6 months (May-November 2007)" (R. 181).

Counsel asked if Plaintiff's past work would still be available if she could not engage in repetitive use of her right arm, to which the VE replied it would not.

The only past work available if the claimant could not reach and work overhead, would be the telemarketing job.

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at Title 20, Code of Federal Regulations (hereinafter "CFR"), §§ 404.1520 and 416.920, ALJ Mills made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2008.

2. The claimant has not engaged in substantial gainful activity since December 31, 2004, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: left shoulder tendonitis; degenerative disc disease/degenerative joint disease of the cervical spine; lumbar degenerative disc disease/disc herniations; plantar warts on the right foot; chronic obstructive pulmonary disease; and decreased vision (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she should only occasionally climb ramps and stairs; balance, stoop and kneel. She should never climb ladders, ropes or scaffolds; crouch or crawl. She should avoid concentrated exposure to extreme heat and cold, vibration, and hazards such as moving plant machinery and unprotected heights.

6. The claimant is capable of performing past relevant work as a telemarketer,

waitress, deli cutter/slicer, bartender and housekeeper. This work does not require the performance of work related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.     The claimant has not been under a disability, as defined by the Social Security Act, from December 31, 2004, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(R. 12-24)

## IV.  Discussion

### A.  Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

The Plaintiff contends:

1.  The ALJ did not properly analyze Plaintiff's complaints of pain and how that pain impacts on her residual functional capacity as set forth in 20 C.F.R. 404.1539 and SSR 86-7p.  (Plaintiff's Brief at p. 8).

2.  The ALJ reached similarly erroneous conclusions regarding Plaintiff's mental impairments. (Plaintiff's Brief at 10).

    The Commissioner contends:

1.  Substantial evidence supports the ALJ''s finding that Plaintiff's allegations of disabling pain and limitations were not entirely credible (Defendant's brief at p. 8).

## C. DIB and Date Last Insured

As a threshold matter, for purposes of Disability Insurance Benefits ("DIB"), Plaintiff must establish disability on or before her date last insured ("DLI") of March 31, 2008.  There is no such time limit for her Social Security Income ("SSI") claim.  The undersigned finds there is simply no evidence that Plaintiff was disabled on or before her Date Last Insured of March 31, 2008.  She had seen no doctors between her alleged onset date in 2004, and her DLI.  She admitted she had not had mental problems until her psychotic break in 2010, except for being treated in the 1980's. Significantly, she listed only problems with her back, leg, and vision in her applications in 2008. The only medical records she listed on her application was an appointment for an eye exam and glasses in 2005.  She conceded in that application that no one else had any medical records or information about her illnesses, injuries, or conditions, and she was not scheduled to see anyone. She was taking no medications.  At the time of her application, which is also nearly the same as her Date Last Insured, she was caring for two grandchildren "24/7."  She had no problem with personal care.  She prepared meals daily, usually  "with a couple of courses" but sometimes ate sandwiches or frozen foods. She did say she couldn't prepare the meals as fast as she used to.  She cleaned house

and did laundry in small loads, every day "but it takes all day." She did not do yard work. She went outside a couple times a week, and rode in a car. She shopped for food once or twice a month, each time taking an hour or two. She could pay bills, handle cash, and handle a checking and savings account. She read books and watched tv. There was no change in her hobbies since her alleged onset date. She spent time with others, talking on the phone to family and friends, and seeing her mother or sister about once a month.

Based on all of the above, but in particular the lack of any medical examination, treatment or medications (even over-the-counter) listed, along with the fact that Plaintiff cared full time for two small children prior to her Date Last Insured, the undersigned finds substantial evidence supports the ALJ's finding that Plaintiff was not disabled prior to March 12, 2008, and is not entitled to Disability or Disability Insurance Benefits.

The undersigned shall continue with the discussion regarding Plaintiff's application for SSI.

### D. Credibility

Plaintiff first argues that the ALJ did not properly analyze her complaints of pain and how that pain impacts on her residual functional capacity as set forth in 20 C.F.R. 404.1539 and Social Security Regulation ("SSR") 96-7p. 1996 WL 374186 (S.S.A.). Defendant contends that substantial evidence supports the ALJ"s finding that Plaintiff's allegations of disabling pain and limitations were not entirely credible.

The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (1984) (citing Tyler v. Weinberger, 409 F.Supp. 776 (E.D.Va. 1976). The ALJ has a "'duty of explanation'" when making

determinations about credibility of the claimant's testimony." See Smith v. Heckler, 782 F.2d 1176, 1181 (4th Cir. 1986) citing DeLoatche v. Heckler, 715 F.2d 148, 150-51 (4th Cir. 1983); see also Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1985).

The Fourth Circuit has developed a two-step process for determination of whether a person is disabled by pain or other symptoms as announced in Craig v. Chater, 76 F. 3d 585 (4th Cir. 1996):

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .
>
> 2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated, See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

Craig, supra at 594.

The ALJ first found that Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms. He therefore found she had met Step One of the Craig analysis, and was required to go onto Step Two.

A review of the ALJ's decision shows he considered Plaintiff's statements about her pain

21

and her daily activities almost exactly as described in Plaintiff's own application in April 2008. He found her activities at that time appeared to be fairly normal. "She was able to care for small children, cook their meals and clean, although she noted that some of these activities took her longer to do now than before. She was able to care for herself and interacted with friends and family." (R. 18.

He noted that Plaintiff told Dr. Monderewicz she had suffered the neck and back pain for five years, but had not undergone any evaluation or treatment or medication for the pain. She stated she had bilateral knee pain and her right knee caused her to fall, but there are no records or reports of her falling in the entire record. Neither did she use any assistive device for ambulation. She reported having vision problems, but was not wearing glasses, and her last eye exam was in 2005.

Plaintiff told Dr. Davis she had had recent bunion surgery, that both knees hurt, and that her right knee gave out unexpectedly. Again, there is no report or record of her actually falling, and she did not use an assistive device to ambulate. She complained of chest pain, but stated she was told that was due to panic. By November 19, 2009, Plaintiff told Dr. Davis her pain medication and Xanax were working better for her. Her panic was much better controlled. This was the first report in the record of any mental impairments, and Plaintiff reported she was under a lot of stress, but that she had a good response to medications.

In December 2009, Plaintiff said she was sleeping ok and feeling better on her medications.

In February, 2010, however, Plaintiff was hospitalized for what was called a "psychotic break," when she became markedly agitated and had decreased sleep and dehydration related to family problems. She was diagnosed with "acute psychosis in a patient with recent decreased sleep, increased anxiety due to situational stress, and recent addition of Wellbutrin to her other

22

medications." She was stable with increased Trileptal and discontinuation of Wellbutrin.

Plaintiff complained of breathing problems and cold-like symptoms in April 2010, which were diagnosed as atelectasis or early developing pneumonia and pyelonephritis. She was treated and reported feeling much better within two weeks. Her lungs were clear, and the pyelonephritis was resolved. Her mood was stable.

Plaintiff testified she lost almost 30 pounds after her psychotic episode, but this seems to be explained in the record by her use of Geodon, which may cause appetite suppression. She still tried to help her daughter as best she could with the (now four) small grandchildren but had to walk away "as she has no patience." Her welfare benefits stopped when her daughter got out of prison and took custody of the children. Notably, Plaintiff was still taking care of one of the grandchildren until the night she had her psychotic episode.

Plaintiff stated she had neck and shoulder problems and broke her collarbone and right leg in a car wreck many years ago. She had knee surgery in 1975. Her back hurt all the time and she had foot problems because of surgery. She said she could not see out of her right eye, but also did not wear prescription glasses to the hearing, nor was there any eye examination or glasses prescribed since 2005.

Plaintiff stated that it hurt for her to walk and she couldn't walk long or far. She had trouble standing on her right foot and bending forward. Some days she could lift five pounds but not more than that, and not frequently. She had pneumonia and smokes but otherwise did not report breathing problems. She did not sleep well. She was uncomfortable sitting. She took care of all her own personal needs. She still did some cooking. On a normal day she did little things, then sat, then did more. She tried to do chores and help out wherever she was staying. She went shopping once per

month.  She could do laundry.

A review of the decision also shows the ALJ took into account all the medical signs, laboratory findings, and "any objective medical evidence of pain," although those were not very extensive and there were absolutely none prior to her applying for benefits. Her MRI findings did not indicate any nerve root or spinal cord compression and she was neurologically intact when evaluated by a neurosurgeon.

A review of the decision also shows the ALJ took into account Plaintiff's daily activities, many of which are already discussed above, but especially noting she was able to work and take care of her grandchildren by herself for several years with most of her impairments.  When she applied in April 2008, she said she could lift 20-30 pounds, care for her grandchildren "24/7" and cook full meals and do housework.

The ALJ also considered the medical treatment Plaintiff took to alleviate her symptoms.  As already noted, she reported absolutely no treatment or medications (even over the counter) in her applications in April 2008.  She was not taking any medications and had no treatment the time of her consultative evaluation in May 2008.  In fact, from the record it appears Plaintiff did not see a doctor from at least 2004 until October 12, 2009.  At that time she established treatment with Dr. Davis.  He prescribed Xanax and pain medication and referred her for physical therapy.  One month later, she told Dr. Davis the pain medication and Xanax were working better for her and her panic was much better controlled.  One month after that, Plaintiff was sleeping ok and feeling better on her medications.  He added Wellbutrin to help her quit smoking.  Notably, Plaintiff did not attend physical therapy as instructed, going only three times, but later reporting to a doctor she had undergone physical therapy.

Plaintiff was treated for her "psychotic episode" with increased Trileptal and discontinuation of Wellbutrin. She stabilized quickly. Both her treating physician and the consulting psychiatrist blamed the episode on dehydration, decreased sleep, increased anxiety due to situational stress, and possibly the recent addition of Wellbutrin. There were no other such episodes reported, and by the time of the hearing, only three months later, Plaintiff was back helping with the grandchildren.

Based on all the above, the undersigned finds the ALJ took into account "all the available evidence" in making his credibility determination.

Plaintiff argues that the ALJ found Plaintiff not credible based on numerous "erroneous conclusions" concerning her daily activities and treatment for her medical impairments. Plaintiff argues the ALJ based his conclusion on Plaintiff's testimony regarding her income and work experience, which led to his conclusion that she was able to care for her grandchildren. Plaintiff argues this conclusion is error, because when the ALJ asked Plaintiff about receipt of welfare, and Plaintiff stated only that she "tried" to care for her granddaughters for a period of time; further, she testified that her ability to do daily chores was limited by her pain, that doing laundry took longer and caused build-up problems, and that she could only do grocery shopping once per month.

The undersigned does not find the ALJ's conclusions regarding Plaintiff's daily activities is "erroneous." Plaintiff did take care of the very young children "24/7," as she said herself, until her daughter came to take them back. Even after that she helped with them. The ALJ did not have to ask what the care entailed, since in her application of 2008, it expressly stated she bathed them, got them up for school, dressed them, fed them multiple course meals (most of the time), and put them to bed, among other things. She kept house and shopped and did the laundry. The ALJ did, in fact, note it took her more time to do these things than previously. Plaintiff also consistently stated she

could take care of her own personal needs, even though it was sometimes painful.

Plaintiff also argues the ALJ erred by referring to a neurological report from December 2009 as evidence that her pain complaints were to be given less weight and credibility. As did the ALJ, the undersigned notes the dearth of any medical evidence whatsoever prior to the consultative exam arranged by the State agency in April 2008. Plaintiff's own treating physician, whom she did not see until a year after she applied for disability, referred her to neurologist Richard Douglas. Dr. Douglas is an expert, examining Plaintiff for her treating physician. Dr. Douglas noted that straight leg raising was negative bilaterally. She had full strength in all major muscle groups. Sensation was intact to pinprick throughout. He noted the MRI which revealed the disc protrusions at L3-4 and L4-5 to the left, but also noted there was no evidence of radiculopathy. He also noted her cervical MRI showed degenerative changes but no nerve root compression. His entire diagnosis was "cervical pain and lumbar pain with right leg pain." Notably, Plaintiff had also informed him she had attended physical therapy, when she had not done so as instructed.

The undersigned finds substantial evidence supports the ALJ's conclusions regarding Dr. Douglas' report, and his finding that that report supports a conclusion that Plaintiff's complaints of pain and limitation were not entirely credible.

### D. Mental Impairments

Plaintiff asserts the ALJ also erred regarding her mental impairments, arguing that the ALJ noted it was significant that there was no record of treatment for any mental impairment prior to October of 2009 (R.23), while not acknowledging that Dr. Davis noted "past medical history is significant for longstanding anxiety . . . she has recently come to my practice and has been on long term treatment with Xanax." (R. 264). Further, Dr. Davis noted Plaintiff's problems with decreased

26

sleep. Finally, Plaintiff argues the ALJ's conclusion that her "psychotic break"may have been a medication reaction or reaction to losing custody of her grandchildren, but that she apparently recovered quickly and her symptoms appear to be well-controlled is at odds with Plaintiff's testimony of dramatic weight loss of more than 25 pounds immediately prior to the hearing as well as continued sleep problems.

First, the ALJ correctly notes there is absolutely no evidence of treatment for any mental impairment prior to October 2009. Plaintiff does not list any mental impairment in her application or in her other paperwork. Plaintiff, in fact, expressly states she had no treatment of any kind since at least her alleged onset date of 2004. At the administrative hearing on May 5, 2010, the ALJ noted there were no "issues of a mental treatment prior to the DLI [Date Last Insured March 2008]," to which Plaintiff's counsel replied that was correct (R. 51).

Dr. Davis' statement in February 2010, that Plaintiff's history was "significant for longstanding anxiety" could therefore only have been based on his treatment of her from October 2009 to February 2010, a total of less than three months. One month after her first appointment with him, Plaintiff told him her pain medicine and Xanax were working "better." She told him she was under "a lot of stress," but her panic was much better controlled on Xanax. On December 8, 2009, a review of systems by Dr. Douglas indicated: "No history of depression or treatment of psychiatric disease." By December 16, 2009, she was sleeping "ok."

The undersigned finds substantial evidence supports the ALJ's determination that Plaintiff had a good response to psychotropic medication until she was admitted to the hospital due to a "psychotic break" on February 2, 2010. Actually, the first sign of Plaintiff's mental episode came two weeks earlier, on January 15, 2010, when Plaintiff reported to Dr. Davis that she had just come

27

"from giving up granddaughter to her mother." She couldn't breathe and couldn't stop crying. The removal of the child was unplanned. She took an extra Xanax. The doctor found Plaintiff distraught, anxious, and crying. He noted she had been doing better on Wellbutrin "until this AM's surprise visit." She was assessed with acute anxiety/hyperventilation; bipolar disorder–stable; right leg and foot pain; and estrogen replacement therapy. Again, her own doctor said "she had been doing better" "until this AM's surprise visit." Notably, her bipolar disorder was listed as stable, and her anxiety and hyperventilation as "acute"– defined as "having a short and relatively severe course."[16]

Plaintiff's complaint regarding the ALJ's conclusion that her psychotic break may have been a medication reaction or reaction to losing custody of her grandchildren, lacks merit, for the simple reason that those were the reasons provided by her own treating physicians. Psychiatrist Salman stated Plaintiff was "apparently [] overwhelmed with taking care of her grandsons." She reported she was unable to sleep at night and was having mood swings. "She is overwhelmed with her family situation." Her daughter was making attempts to keep Plaintiff away from the children "and this is what is making her extremely distraught."

Dr. Davis' own diagnosis was:

Acute psychosis[17],[18] in a patient with recent decreased sleep, increased anxiety due

---

[16]Dorland's Illustrated Medical Dictionary, p. 24 (32nd ed., 2012).

[17]While there is no definition of acute psychosis in Dorland's Illustrated Medical Dictionary, there is a definition for acute delusional psychosis, defined as a reactive psychosis resembling schizophrenia but having a duration of less than three months and a favorable prognosis.

[18]While there is no definition of acute psychosis in the DSM-IV, there is a definition for Brief Psychotic Disorder, formerly known as brief reactive psychosis, the essential feature of which is a disturbance that involves the sudden onset of at least one of the following positive psychotic symptoms: delusion, hallucinations, disorganized speech, or grossly disorganized or

to situational stress, and recent addition of Wellbutrin to her other medications. Now appears stable with an increase in her dose of Trileptal and discontinuing of the bupropion [the generic name for Wellbutrin].

Plaintiff's argument that the ALJ improperly stated her "symptoms appear to be well-controlled" is also without merit. First, the diagnosis itself is that the episode is *per se* brief. In fact, later on the same day as her hospitalization, treating physician Dr. Davis opined Plaintiff's psychiatric status was "mildly agitated, but certainly controlled." She did not appear to require any further one-to-one observation. She denied any hallucinations or suicidal or homicidal intent. Only two months after her hospitalization Dr. Davis diagnosed only "anxiety."

Plaintiff finally argues that the ALJ's determination that she apparently recovered quickly from her psychotic break and that her symptoms appeared to be well-controlled is at odds with Plaintiff's testimony of dramatic weight loss of more than 25 pounds immediately prior to the hearing as well as continued sleep problems. As already noted, however, the record indicates Plaintiff lost the 25 pounds since her hospitalization in early February, and as a result of her having

---

catatonic behavior. An episode of the disturbance lasts at least one day but less than 1 month, and the individual eventually has a full return to the premorbid level of functioning.

Brief Psychotic disorder with marked stressors may be noted if the psychotic symptoms develop shortly after and apparently in response to one or more events that, singly or together, would be markedly stressful to almost anyone in similar circumstances in that person's culture. The precipitation event may be any major stress . . . .the decision will depend on related factors such as the temporal relationship between the stressor and the onset of the symptoms, ancillary information from a spouse or friend about level of functioning prior to the stressor, and history of similar responses to stressful events in the past.

Individuals with Brief Psychotic Disorder typically experience emotional turmoil or overwhelming confusion. They may have rapid shifts from one intense affect to another. Although brief, the level of impairment may be severe, and supervision may be required to ensure that nutritional and hygienic needs are met and that the individual is protected from the consequences of poor judgment, cognitive impairment, or action on the basis of delusions.

Diagnostic and Statistical Manual of Mental Disorders (Fourth ed. 1994).

been prescribed Geodon. Also significant is that she had been ill for at least one or two weeks with cold-like symptoms that were eventually diagnosed as atelectasis or early pneumonia and pyelonephritis. Most importantly, no doctor seemed concerned about her weight loss.

The undersigned finds the ALJ did not err by concluding Plaintiff's "psychotic break" may have been a medication reaction or reaction to the stress of the claimant losing custody of her grandchildren, and that she apparently recovered quickly and her symptoms appeared to be well-controlled.

Based on all of the above, the undersigned finds substantial evidence supports the ALJ's findings regarding Plaintiff's mental impairments.

## V. RECOMMENDATION

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying the Plaintiff's applications for DIB and SSI. I accordingly recommend Defendant's Motion for Summary Judgment be **GRANTED,** the Plaintiff's Motion for Summary Judgment be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn,

474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 27 day of July, 2012.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE